# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **BEL FUSE, INC.,** <br> **BEL FUSE, LTD.,** <br> **BEL FUSE (MACAU COMMERCIAL** <br> **OFFSHORE) LTD.,** <br> **BEL CONNECTOR, INC. and** <br> **BEL TRANSFORMER, INC.** <br><br> Plaintiffs, <br><br> v. <br><br> **HALO ELECTRONICS, INC.,** <br><br> Defendant. | **Case No. 2:07-cv-02168-GEB-ES** <br><br> **FINAL PRETRIAL ORDER** |

This matter having come before the Court for a pretrial conference pursuant to Fed. R. Civ. P. 16; and Cozen O'Connor having appeared for Plaintiffs, and McCarter & English and Fish & Richardson having appeared for Defendant; the following Final Pretrial Order is hereby entered:

1.    JURISDICTION (set forth specifically).

**This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 100 *et seq.* This Court has jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. §§ 1331 and 1338. This Court has personal jurisdiction over Defendant because Defendant is doing business within this State and judicial district, transacts business within this State and judicial district, and is otherwise within the jurisdiction of this Court.**

2.    PENDING/CONTEMPLATED MOTIONS (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or to the calendar. Also, set forth the nature of the motion and the return date. If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position).

**Plaintiffs' Pending Motions:**

1.    ~~Motion for Summary Judgment of No Invalidity of U.S. Patent No. 5,786,010 [Dkt. No. 160; Return Date: 2/7/11 at 10 a.m.]~~      *GEB*

2.    **Motion to Seal certain papers relating to Motion #1 [Dkt. No. 159; Return Date: 2/7/11 at 10 a.m.]**   *GRANTED*   *GEB*

3.    **Motion to Seal certain papers filed in opposition to Halo's motion for summary judgment of invalidity [Dkt. No. 163; Return Date: 2/22/11 at 10 a.m.]**   *GRANTED*   *GEB*

4.    **Motion to Seal certain papers relating to Motion for Summary Judgment of Literal Infringement pursuant to 35 U.S.C. § 271(a) [Dkt. No. 157; Return Date: 2/7/11]**   *GRANTED*   *GEB*

5.    **Motion to Seal certain papers filed in further support of Plaintiffs' motion for summary judgment of no invalidity [Dkt. No. 175; Return Date: 3/7/11 at 10 a.m.]**   *GRANTED*   *GEB*

**Plaintiffs' Contemplated Motions:**

1.    **Motion in Limine to Preclude the Testimony of Mroczkowski and/or Blichasz**
Plaintiffs intend to move this Court to preclude the trial testimony of Halo's experts, Dr. Robert S. Mroczkowski and/or Mr. Charles Blichasz, on the ground that, based upon, among other things, their nearly identical expert reports, these individuals' testimony will constitute "undue delay, waste of time, or needless presentation of cumulative evidence" in contradiction to the standards of Fed. R. Evid. 403.   *BRIEF AS PER 4.15*   *GEB*

2.    **Motion in Limine to Preclude Halo from Referring to Certain References as "Prior Art" at Trial**
        Plaintiffs intend to move this Court to preclude Defendant from referring to certain documents as "prior art" during the trial, as the application of such a term to a reference is a conclusion that must first be proved to the trier of fact. Plaintiffs will be prejudiced, and the jury will be confused, by the premature (and, perhaps, ultimately incorrect) use of the term "prior art."   *HALO WILL REFER TO "ALLEGED PRIOR ART"*   94b

3.    **Motion in Limine to Preclude Halo from Discussing or Mentioning their Inequitable Conduct Allegations and/or Facts Underlying Those Allegations to the Jury**
        Plaintiffs intend to move this Court to preclude Defendant from discussing or mentioning their inequitable conduct allegations and/or facts underlying those allegations to the jury. Since Halo's allegations of inequitable conduct will be heard by the Judge, any mention or discussion of those allegations or facts underlying the allegations to the jury will be prejudicial to Plaintiffs, or cause confusion.   *MOOT*   99b

4.    **Motion in Limine to Preclude Halo from Relying on or Referring to Late-Produced Documents**
        Plaintiffs intend to move this Court to preclude Defendant from relying on or referring to documents bearing Bates numbers HALO-NJ-0273345-273347; HALO-NJ-0273348-273357; and HALO-NJ-0273358-273368, as Defendant disclosed these documents after the close of fact discovery in violation of the Court's order an in contradiction to the standards of Fed. R. Civ. P. 37(c), and Plaintiffs' expert did not have the opportunity to review them before his rebuttal expert report was due.   *BRIEF AS PER ¶ 15*   9 2b

5.    **Motion in Limine to Preclude Halo's Experts from Testifying on Matters Not Disclosed in their Expert Reports**
        Plaintiffs intend to move this Court to preclude Messrs. Mroczkowski and/or Blichasz from testifying at trial as to subjects, facts, statements, conclusions and opinions not included in their expert reports, on the ground that such testimony will be prejudicial to Plaintiffs, who have not had the opportunity to evaluate and/or rebut such matters.   *BRIEF AS PER ¶ 15*   92b

        **Defendant's Pending Motions:**

        None.

        **Defendant's Contemplated Motions:**

1.    ***Daubert* motions seeking to preclude some or all of the testimony of plaintiffs' damages expert Michele Riley**
        The reasonable royalty calculations performed by Ms. Riley are neither relevant nor reliable, and should therefore be excluded. Ms. Riley was not available for deposition during the expert discovery period and therefore the parties agreed to proceed with Ms. Riley's deposition on her first availability, February 15, 2011. As a result, Halo reserves the right to amend or supplement the nature of its *Daubert* motions to preclude some or all of the testimony of Ms. Riley.   *BRIEF AS PER ¶ 15*   9 2b

3

2.     **Motion in *limine* to exclude mention that Halo infringes any claim of the '910 patent in front the jury**

Bel Fuse should not be allowed to tell the jury that Halo "infringes" or is an "infringer," as that would confuse the jury and unfairly prejudice them against Halo. Based upon the Court's claim constructions and other rulings, the parties entered into a Stipulation on January 24, 2010. Based on that Stipulation, Bel Fuse may say the Halo products identified in Exhibit B satisfy the claim limitations of certain claims and that those products were sold or offered for sale by Halo within the United States or imported by Halo into the United States. *BEL FUSE SHALL SAY "COVERED" BY NOT "INFRINGED"*

3.     **Motion in *limine* to exclude plaintiffs from arguing that the Bay Networks circuit is not prior art**

Bel Fuse does not dispute that the named inventors did not conceive of the Bay Networks circuit, in fact, Bel Fuse admits as much. Rather, Bel Fuse argues the documents evidencing Bay Networks's repeated communications of the Bay Networks circuit to the named inventors are not themselves prior art because their alleged "conception" occurred before the date on some of those documents. *BRIEF AS PER THIS*

4.     **Motion in *limine* to prevent Bel Fuse from referring to non-accused transactions (e.g., Halo US to Europe) or transactions of other entities (e.g., Halo Hong Kong and Halo Singapore)**

Bel Fuse has not accused any transactions concerning Subgroups 2 through 7 (as described in Doc. No. 158) of infringement. Thus, Halo now seeks to preclude Bel Fuse from introducing evidence or argument, or otherwise making reference to products, transactions or financial information that are not directly related to the accused products and transactions identified in Exhibit B to the parties' January 24, 2011 Stipulation. This information should be excluded because it is irrelevant to any issue in the case and reference to it would unfairly prejudice Halo, confuse the issues, mislead the jury, and unnecessarily waste time. *BRIEF AS PER THIS*

5.     **Motion in *limine* to prevent Bel Fuse from arguing that the Patent Office made a determination that "conception" occurred before December 14, 1994 or that the '910 patent has been found valid in light of prior art combinations that include the Bay Networks circuit**

The Patent Office accepted the misrepresentations of the patentee with respect to the alleged conception as true. Bel Fuse withheld information necessary for the Patent Office to make a fair and accurate assessment of conception. Because of this, any such "determinations" made by the Patent Office are irrelevant to any issue in the case and reference to them would unfairly prejudice Halo, confuse the issues, mislead the jury, and unnecessarily waste time. *BRIEF AS PER THIS*

3.     STIPULATION OF FACTS (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties).

1.     Plaintiff Bel Fuse, Inc. is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 206 Van Vorst Street, Jersey City, New Jersey.

2.   Defendant Halo Electronics, Inc. ("Halo") is a corporation organized and existing under the laws of the state of Nevada with a principal place of business at 1861 Landings Drive, Mountain View, California. 

3.   U.S. Patent No. 5,736,910 ("the '910 patent") is entitled "Modular Jack Connector With A Flexible Laminate Capacitor Mounted On A Circuit Board."

4.   The application for the '910 patent was filed with the U.S. Patent and Trademark Office ("PTO") on November 22, 1995.

5.   The '910 patent issued on April 7, 1998.

6.   The named inventors of the '910 patent are Peter K. Townsend, Ted R. Meckley, David Hatch, Don McClune, and Robert J. Brennan.

7.   A "modular connector" is a device that connects a transmission wire to a printed electrical circuit board.

8.   The Court has construed the term "capacitor" as used in the '910 patent to mean "a circuit component that provides a known amount of capacitance (ability to store an electric charge) consisting of two conducting surfaces separated by an insulating material or dielectric."

9.   The Court has construed the term "modular connector" as used in the '910 patent to mean "a modular jack connector to which conductors of a circuit may be connected and into which a modular plug may be inserted."

10.  The Court has construed the terms "coupled" and "electrically coupled" to mean "the items are associated in such a way that power or energy may be transferred from one to another."

11.  Halo sells integrated connector modules under the name FastJack$^{TM}$.

12.  Bel Fuse brought an infringement lawsuit against Halo on May 8, 2007.

13.  Halo filed a request with the PTO for *ex parte* reexamination of the '910 patent on June 26, 2008.

14.  On September 22, 2008, the Court stayed the case pending the disposition of the reexamination.

15.  The references cited by Halo during the reexamination included, among others, "Connecting the DECchip 21140 PCI Fast Ethernet LAN Controller to the Network: An Application Note" ("the DEC Note"); U.S. Patent No. 5,587,884 to Raman ("Raman"); and U.S. Patent No. 4,789,847 ("Sakamoto '847").

16. On May 18, 2009, Bel Fuse submitted a Declaration of Prior Invention under 37 C.F.R. 1.131 signed by all of the living named inventors of the '910 patent, and supporting exhibits.

17. On August 14, 2009, Bel Fuse submitted a response to the PTO's Office Action.

18. The August 14, 2009 response to the PTO's Office Action included the Declaration of Prior Invention under 37 C.F.R. 1.131 of Colin W. Dunn ("the Dunn Declaration") and supporting exhibits.

19. Claims 11-13 and 17-22 of the '910 patent are being asserted by Bel Fuse in the instant litigation.

20. Claims 11-13 are independent claims, while claims 17-22 are dependent claims.

21. Claims 17, 19, 21, and 22 depend on claim 13; claim 18 depends on claim 17; and claim 20 depends on claim 19.

22. Mr. Yuval Bachar is a former employee of DEC.

23. U.S. Patent No. 5,321,372 ("the Bob Smith patent") was issued to Robert W. Smith on June 14, 1994.

24. U.S. Patent No. 5,069,641 is prior art to the '910 patent under 35 U.S.C. § 102(a).

25. U.S. Patent No. 5,069,641 is prior art to the '910 patent under 35 U.S.C. § 102(b).

26. U.S. Patent No. 4,789,847 is prior art to the '910 patent under 35 U.S.C. § 102(a).

27. U.S. Patent No. 4,789,847 is prior art to the '910 patent under 35 U.S.C. § 102(b).

4.    PLAINTIFF'S CONTESTED FACTS (State separately for each plaintiff. Proofs shall be limited at trial to the matters set forth below. Failure to set forth any matter shall be deemed a waiver thereof).

    A.    Plaintiff intends to prove the following contested facts with regard to liability:

1. Plaintiff Bel Fuse, Ltd. is a corporation organized and existing under the laws of Hong Kong with its principal place of business at 8/F 8 Luk Hop Street, Kowloon, Hong Kong.

2. Bel Fuse, Ltd. is a subsidiary of Bel Fuse, Inc.

3. Plaintiff Bel Fuse (Macau Commercial Offshore) Ltd. is a corporation organized and existing under the laws of Macau with its principal place of business at Rua De Xangai No. 175, Edificio Da Associacao Commercial De Macau, 13 Andar H-K, Macau.

4. Bel Fuse (Macau Commercial Offshore) Ltd. is a subsidiary of Bel Fuse, Inc.

5.    Plaintiff Bel Connector, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 11118 Susquehanna Trail South, Glen Rock, Pennsylvania.

6.    Bel Connector, Inc. is a subsidiary of Bel Fuse, Inc.

7.    Plaintiff Bel Transformer, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 500 Bayview Avenue, Inwood, New York.

8.    Bel Transformer, Inc. is a subsidiary of Bel Fuse, Inc.

9.    Non-party Stewart Connector Systems, Inc. ("Stewart") is a designer/manufacturer of modular jacks and plugs for the telecommunications, local area network (LAN), data processing, medical instrumentation, automotive, and industrial markets.

10.    Bel Fuse, Inc. acquired the assets of Stewart on March 22, 2003.

11.    Synoptics was a customer of Stewart which later became known as Bay Networks.

12.    Messrs. Townsend, Meckley, Hatch, McClune, and Brennan signed an oath affirming that they are the true inventors of the '910 patent.

13.    Plaintiffs Bel Fuse, Inc., Bel Fuse, Ltd., Bel Fuse (Macau Commercial Offshore) Ltd., Bel Connector, Inc. and Bel Transformer, Inc. (collectively "Bel Fuse") are the assignees of all right, title and interest in and to the '910 patent.

14.    The '910 patent relates to modular connectors that include specific circuitry integrated with the modular connector for providing balanced signal pairs and impedance to high frequency noise and interference.

15.    A modular connector is also a particular type of connector commonly used to facilitate a connection between one communication line, such as a computer line, with another communication line or system.

16.    Electrical devices are often coupled by modular jack connectors.

17.    Electrical devices are frequently adversely affected by the presence of radio frequency interference in the electrical lines connecting the devices to, e.g., data communication lines.

18.    Electrical devices also function as a source of radio frequency interference.

19.    It was known at the time of the invention of the '910 patent to interpose filters between connected electrical devices to attenuate or reduce the interference and minimize its effect on the operation of the electrical devices.

20.   Prior art modular connectors describe an integration of filter circuits into modular connectors.

21.   The '910 patent was the first to disclose an integration of a resistive termination circuit (specifically, one more commonly known as a "Bob Smith termination circuit") in addition to filter circuits into connectors.

22.   The integrated circuitry disclosed in the '910 patent includes a set of resistors coupled at one of their ends to the contacts of the connector that mate with respective contacts of a plug; a capacitor having a first end coupled to ground; and a common node coupled to a second end of the capacitor and a second end of each resistor.

23.   By integrating the above-described circuitry with the modular jack connector, the inventors of the '910 patent provided a modular connector with the capability of reducing noise and preventing the creation of reflected waves.

24.   By integrating the above-described circuitry with the modular jack connector, the inventors of the '910 patent provided a modular connector also capable of avoiding additional, separate circuitry components on the main printed circuit board.

25.   The integration of the above-described circuitry with the modular jack saved space on the main printed circuit board.

26.   The advantages of integration include prevention of transmission effects, noise suppression, improved emissions performance, reliability, simplicity in system design, lower costs, and space-savings on the printed circuit board.

27.   Bel Fuse's MagJack® ICMs are the commercial embodiment of the technology disclosed in the '910 patent.

28.   At least 98 percent of Bel Fuse's MagJacks® embody the technology disclosed in the '910 patent.

29.   The MagJack® ICMs were first sold and/or offered for sale by Bel Fuse and the entity whose assets it acquired, Stewart, in or about 1999.

30.   The acquisition by Bel Fuse of Stewart's asserts occurred in large part because of the development of the MagJack®.

31.   Bel Fuse has generated substantial worldwide revenue from the sale of its MagJack® products.

32.   In the first three quarters of 2010, Bel Fuse earned approximately $70 million from the MagJack® product line.

33.   Between January 1, 2003 and December 31, 2006, worldwide sales of the MagJack® product exceeded $328 million.

34.  From May 8, 2007 until November 4, 2010, Bel Fuse sold over 97.6 million MagJack® units worldwide.

35.  From May 8, 2007 until November 4, 2010, Bel Fuse earned $284.7 million in revenue from MagJack® sales.

36.  Bel Fuse's revenues significantly increased as its MagJack® line of ICMs continued to expand.

37.  Halo departed from its magnetics-only business model to one which would allow the company to provide integrated connectors to its existing customers.

38.  Certain of Halo's FastJacks include a Bob Smith termination circuit.

39.  Halo has touted the benefits of FastJack$^{TM}$ integrated connectors in its marketing materials.

40.  Halo has attempted to make its FastJack$^{TM}$ products look more like Bel Fuse's MagJacks®.

41.  Other competitors in the integrated connector market, including Pulse Electronics, have also utilized the technology disclosed in the '910 patent.

42.  The MagJacks have enjoyed overwhelming commercial success.

43.  In its request for reexamination, Halo cited a number of references in an effort to invalidate the '910 patent.

44.  The Dunn Declaration proves that conception of the inventions of the asserted claims of the '910 patent occurred before December 14, 1994, and reduction to practice by February 8, 1995, and that there was proper diligence between those dates.

45.  The August 14, 2009 response addressed all of the references cited by Halo in its reexamination request on the merits.

46.  Attached as Exhibit C to the Dunn Declaration was a fax from Mr. Russell Jacobs to Mr. R. Lee Hill dated November 17, 1994.

47.  At the time of the November 17, 1994 fax, Mr. Jacobs was an employee of Stewart, and Mr. Hill was a consultant for Stewart.

48.  The November 17, 1994 fax consists of a cover page and a circuit diagram.

49.  The circuit diagram attached to the November 17, 1994 fax was drawn by Mr. Brennan during a meeting between Synoptics (Bay Networks) and Stewart.

50.  On December 22, 2009, the PTO issued an *Ex Parte* Reexamination Certificate confirming all of the claims of the '910 patent without amendment.

Case 2:07-cv-02168-GEB -ES   Document 182   Filed 02/10/11   Page 10 of 44 PageID: 6513

51.   The PTO based its decision, in part, on the Dunn Declaration.

52.   The PTO determined that the Dunn Declaration and other evidence and arguments submitted during the reexamination established that conception of the inventions of the asserted claims of the '910 patent occurred before December 14, 1994, and reduction to practice by February 8, 1995.

53.   The PTO removed the DEC Note (among other references) as valid prior art.

54.   The PTO removed Raman as valid prior art.

55.   The PTO considered Sakamoto '847, and rejected Halo's arguments with respect to that reference.

56.   The PTO withdrew the rejections of claims 1, 11 and 13 of the '910 patent.

57.   On June 4, 2009, Bel Fuse submitted an IDS containing U.S. Patent No. 5,069,641 to Sakamoto ("Sakamoto '641").

58.   The PTO considered Sakamoto '641 during the reexamination.

59.   The PTO reviewed Sakamoto '641 during the reexamination.

60.   The PTO stated during the reexamination that claims 11, 12 and 13 are confirmed over the prior art that was explained in the request and determined to raise a substantial new question of patentability in the order granting reexamination and over the prior art that was applied and discussed by the examiner in the present reexamination proceeding.

61.   Some time before November 17, 1994, two employees of Stewart, Messrs. David Hatch and Robert Brennan, met with several engineers employed by Bay Networks regarding sales of Stewart's products.

62.   Bay Networks was having trouble with interference in a printed circuit board that included a modular connector.

63.   During the Stewart/Bay Networks meeting, Mr. Brennan drew a circuit diagram.

64.   Mr. Brennan suggested that he could solve Bay Networks' interference problem by integrating circuitry into a modular connector.

65.   Mr. Brennan conceived of the idea of integrating the Bob Smith termination circuit into a modular connector.

66.   Mr. Brennan conceived of the idea of integrating the Bob Smith termination circuit into a modular connector prior to December 14, 1994.

67.   The only known attendees at the meeting were employees of either Stewart or Bay Networks.

68.   The connector later became known as the MagJack®.

69.   A Non-Disclosure Agreement was entered into between Stewart and Bel Fuse on December 16, 1994.

70.   The Non-Disclosure Agreement entered into between Stewart and Bel Fuse on December 16, 1994 related to the MagJack® project.

71.   A Non-Disclosure Agreement was entered into between Bay Networks and Stewart on December 30, 1994.

72.   The Non-Disclosure Agreement entered into between Bay Networks and Stewart on December 30, 1994 related to the MagJack® project.

73.   Stewart, Bay Networks, and Bel Fuse held their first joint meeting on the MagJack® project on January 5, 1995.

74.   The level of ordinary skill in the art with respect to the relevant art associated with the '910 patent is a person having an undergraduate degree or the equivalent in the field of electrical engineering or a related ancillary field and at least three years of experience in signal transmission line design and electrical connectors. Alternatively, a greater length of experience in signal transmission line design and electrical connectors could replace the degree requirement.

75.   Halo is asserting that the '910 patent is invalid because it would have been obvious to one skilled in the art to combine U.S. Patent No. 5,069,641 to Sakamoto ("Sakamoto '641") with one or more of the following references: (1) the DEC Note; (2) "Digital Equipment Corporation's 21140 Controller" ("the DEC Schematic") (the DEC Note and DEC Schematic comprising "the DEC documents"); and/or (3) the "Bay Networks circuit."

76.   There is no evidence that the DEC Schematic was either shown to others or published.

77.   In his 2009 Declaration, Mr. Bachar states generally that DEC created schematic diagrams that it distributed to customers.

78.   Mr. Bachar's 2009 Declaration does not state that the DEC Schematic itself was publicly disclosed.

79.   In his 2011 Declaration, Mr. Bachar stated that he has no personal recollection of distributing the DEC Schematic to a specific customer.

80.   Mr. Bachar stated in his 2011 Declaration that he cannot say with complete certainty that the specific DEC Schematic cited by Halo was distributed to a DEC customer.

81.   No one, including Mr. Bachar, has any knowledge as to whether the DEC Schematic was publicly disclosed.

82.   If the DEC Schematic was publicly disclosed, there is no evidence that it was disclosed before the conception date of the '910 patent.

83.   There is no evidence that the DEC Note was publicly disclosed.

84.   The cover page of the DEC Note says, "Revision/Update Information: Preliminary - December 14, 1994."

85.   There is no evidence that the DEC Note cited by Halo and bearing the date of December 14, 1994 was the final version.

86.   If the DEC Note was published, it must have been published after December 14, 1994.

87.   During the reexamination of the '910 patent, the PTO determined that the DEC Note was not prior art because Bel Fuse was able to antedate it.

88.   In its Notice of Intent to Issue Ex Parte Reexamination Certificate, the PTO stated that conception occurred prior to December 14, 1994 and reduction to practice by February 8, 1995.

89.   In its Notice of Intent to Issue Ex Parte Reexamination Certificate, the PTO stated that proper diligence between conception and reduction to practice was shown.

90.   The Bay Networks Circuit consists of a handwritten circuit diagram made by Mr. Brennan.

91.   There is no evidence that the Bay Networks Circuit was ever publicly available.

92.   Mr. Brennan drew the circuit during a meeting with Synoptics (Bay Networks).

93.   The only known attendees at the Stewart/Bay Networks meeting were all employees of either of these two companies.

94.   Stewart and Bay Networks entered into a mutual non-disclosure agreement soon after the Stewart/Bay Networks meeting.

95.   The only dissemination of the Bay Networks Circuit occurred when Mr. Jacobs faxed the drawing to Mr. Hill.

96.   At the time of the above-referenced dissemination, Mr. Jacobs was a Stewart employee, and Mr. Hill was a consultant for Stewart.

97.   The Bay Networks Circuit does not teach the inventions of the '910 patent.

98.   It is unclear what the Bay Networks Circuit discloses.

99.   It is arguable whether the Bay Networks Circuit incorporates a Bob Smith termination circuit.

100.    The Bay Networks Circuit shows an inductor used for wire pairs 3 and 5, and 4 and 6, respectively.

101.    The '910 patent claims a resistor, not an inductor, for the wire pairs similarly situated to those described immediately above.

102.    The above-referenced 3 and 5, and 4 and 6 wire pair combinations shown in the Bay Networks Circuit are not standard pair combinations known in the art nor claimed in the '910 patent.

103.    One of ordinary skill in the art would not conclude that it would have been obvious to combine the alleged Bay Networks Circuit or DEC Documents with Sakamoto '641 because Sakamoto '641 only discloses integrated filters.

104.    Halo has not shown or proven any reason or motivation to combine the references it cites to arrive at the inventions of the '910 patent.

105.    None of the references cited by Halo disclose a termination circuit integrated within the housing of the modular connector.

106.    Sakamoto '641 discloses a filter integrated into the connector.

107.    Sakamoto '641 only discloses filters.

108.    In the previous Murata litigation that Halo references, the Court construed "suppressing" used in "electronic element for suppressing noise" from Sakamoto '641 to mean "eliminating or attenuating," which is the function of a filter.

109.    Sakamoto '641 does not disclose a termination circuit integrated into the connector.

110.    A termination prevents the formation of reflected waves at the ends of a transmission line.

111.    A filter reduces or "attenuates" unwanted noise.

112.    Filters are used to reduce both low-frequency noise and high-frequency noise, as well as common-mode noise.

113.    A Bob Smith termination circuit does not filter anything.

114.    A Bob Smith termination circuit is not a noise-suppression circuit.

115.    A Bob Smith termination circuit is not a filter circuit.

116.    There is nothing in Sakamoto '641 that mentions transmission line termination or teaches the incorporation of the termination into the modular jack.

117. The fact that Mr. Hill used the term "noise" in an earlier case and Mr. Baxter uses the term "signals" in this case is insignificant. Both experts agree that the termination functions to prevent the creation of reflected waves, not as a filter.

118. The Bob Smith termination circuit existed prior to the '910 patent.

119. The '910 patent was the first to disclose the idea of integrating the Bob Smith termination circuit with various other filters, including transformers, within a modular jack.

120. At the time of the filing of the '910 patent application, it was thought doubtful that a termination circuit and filtering components could fit within the small confines of a modular jack.

121. By moving the circuitry into the jack, valuable space was saved on the printed circuit board.

122. Moving the circuit into the jack allowed manufacturers to either make smaller products or add additional functionality in the same space.

123. There is a potential cost savings as more components are integrated into the jack.

124. Integrating all the termination and filtering components into a shielded modular jack resulted in superior transmission performance.

125. Neither Sakamoto '641 nor any of the non-patent publications cited by Halo disclose a Bob Smith termination circuit integrated within a connector.

126. The DEC Note/Schematic does not teach a termination circuit being integrated with a modular connector.

127. The DEC Note/Schematic shows a termination circuit.

128. The termination circuit shown in the DEC Note/Schematic is external to and separate from the modular jack.

129. The termination circuit shown in the DEC Note/Schematic is located on the main printed circuit board.

130. There is nothing in the DEC Note/Schematic suggesting that the termination circuit could be incorporated into the modular jack.

131. There is no evidence to suggest that DEC Note/Schematic ever contemplated integrating the Bob Smith termination circuit with a modular connector.

132. The Bob Smith patent discloses the Bob Smith termination circuit.

133. The PTO considered the Bob Smith patent during the prosecution of the '910 patent application.

134.    The PTO determined that the '910 patent was patentable over the Bob Smith patent.

135.    The Bob Smith patent discloses the same termination circuit as the DEC Note and alleged "Bay Networks" circuit.

136.    The DEC Schematic does not disclose a termination circuit with resistors integrated with a modular jack connector.

137.    The DEC Schematic discloses a termination circuit external to the modular jack connector.

138.    U.S. Patent No. 4,695,115 to Talend (the "Talend patent") teaches the integration of filter circuitry into a modular connector.

139.    The Examiner during the prosecution of the '910 patent considered the Talend patent.

140.    The PTO determined that the '910 patent was patentable over the Talend patent.

141.    The expert report submitted by Les Baxter provides support for Bel Fuse's position that the '910 is not invalid.

142.    Halo ignores the engineering difficulties presented by integrating a Bob Smith termination circuit and filter circuit into a modular connector, difficulties recognized by those skilled in the art at the time of the inventions.

143.    Integrating both the Bob Smith termination circuit and noise reducing filter elements into the modular jack was problematic in 1995 from an engineering perspective and far from intuitive or obvious.

144.    The invention in the inventors' possession at the time of filing the '910 patent application was not limited to flexible or pleated capacitors.

145.    In addition to flexible capacitors, the '910 patent discloses other capacitors.

146.    The abstract filed with the original application specified "*[i]n one embodiment*, the capacitor is a flexible laminate assembly" (emphasis added).

147.    The '910 patent at 2:51-54 states, "[i]n accordance with *another embodiment* of the invention, the contacts of the first set of…is coupled to a capacitor, *such as* the pleated capacitor described above" (emphasis added).

148.    Claim 12 as originally filed was not limited to a pleated capacitor.

149.    Figure 7 of the '910 patent does not depict a flexible capacitor.

150.    Once it is clear that a capacitor other than a pleated capacitor is disclosed in the specification, it would be a simple matter for a person of skill in the art to select any suitable capacitor from non-pleated capacitors available at the time based on desired electrical characteristics and size requirements.

151. The best mode known to the inventors at the time of filing the application was not a modular jack including a "Chen capacitor."

152. There is no testimony from anyone who has been deposed in this case that the so-called "Chen capacitor" could be integrated with the modular jack connector.

153. When the inventors filed the application of the '910 patent, they believed that a modular connector including a flexible capacitor was the best mode of practicing the claimed invention.

154. Mr. Hatch was not involved in the decision to use the flexible capacitor.

155. Mr. Hatch's knowledge regarding the flexible capacitor is limited because he was not involved in its implementation.

156. It was another named inventor, Peter Townsend, who "was looking into the best way to make the capacitor."

157. The '910 patent describes the flexible capacitor embodiment as the best mode known at the time of filing.

158. As of the filing date of the '910 patent application (November 22, 1995), Stewart decided to implement the flexible capacitor in the design of the MagJack®.

159. The inventors were still working on the flexible capacitor with the intent of incorporating it into the final product months after filing the patent application.

160. Due to problems with the flexible capacitor, Stewart decided to implement a "discrete surface mount capacitor" instead of a flexible capacitor on July 17, 1996.

161. Halo has stipulated that all of the elements of the following claims of the '910 patent can be found in all of the products that comprise Product Families A-H and identified in Exhibit A to the January 24, 2011 Stipulation [Dkt. No. 165]: the elements of claims 11, 13, 17-20 and 22 are present in Product Families A and B; the elements of claims 11, 13, 19, 20 and 22 are present in Product Families C and H; the elements of claims 13, 17-20, and 22 are present in Product Family D; and the elements of claims 11-13 and 17-22 are present in Product Families E, F and G.

162. Halo has also stipulated that one or more of each product identified in Subgroup 1 of the previously listed Product Families and identified in Exhibit B to the January 24, 2011 Stipulation [Dkt. No. 165] has been offered for sale or sold within the United States (in the quantities and for the price stated in Exhibit B), or imported into the United States (in the quantities and for the price stated in Exhibit B).

163. Halo stipulated to infringement of the asserted claims of the '910 patent on January 24, 2011.

164. Halo's stipulation of infringement was signed by Judge Brown on February 1, 2011.

165.   Halo's infringement of the '910 patent has been and continues to be willful and deliberate.

166.   Halo has no credible non-infringement position.

167.   Halo has no credible invalidity position.

168.   Halo has continued to make, use, sell, offer for sale and/or import the accused products in the United States after learning of Bel Fuse's accusations of infringement, i.e., since at least as early as May 10, 2007.

169.   Halo acted despite an objectively high likelihood that its actions constituted infringement of a valid patent.

170.   There is no evidence that any of the named inventors or attorneys/agents that prosecuted the '910 patent during the original prosecution or reexamination withheld any material reference with an intent to deceive, or affirmatively misrepresented a material fact.

171.   Halo cannot meet its burden of proving that any of the named inventors or attorneys/agents that prosecuted the '910 patent during the original prosecution or reexamination committed inequitable conduct.

172.   The '910 patent is valid and enforceable.

173.   Halo cannot meet its burden of proving that claims 11-13 and 17-22 of the '910 patent are invalid as obvious under 35 U.S.C. § 103.

174.   The differences between the prior art cited by Halo and the inventions of the asserted claims of the '910 patent are substantial.

175.   Halo cannot meet its burden of proving that claims 11-13 and 17-22 of the '910 patent are invalid for failure to satisfy the best mode requirement of 35 U.S.C. § 112.

176.   Halo cannot meet its burden of proving that claims 11-13 and 17-22 of the '910 patent are invalid for failure to satisfy the written description requirement of 35 U.S.C. § 112.

177.   Halo is not entitled to reasonable attorneys' fees and costs under 35 U.S.C. § 285 and/or 28 U.S.C. § 1927.

178.   HILL000901-902 is not prior art to the '910 patent.

179.   HILL000723 is not prior art to the '910 patent.

180.   BF006141-42 is not prior art to the '910 patent.

181.   Bay Networks Transformer Part No. 330-025 is not prior art to the '910 patent.

182.   HALO-NJ-0001719-28 is not prior art to the '910 patent.

**183.** HALO-NJ-0001511-32 is not prior art to the '910 patent.

**184.** U.S. Patent No. 5,587,884 is not prior art to the '910 patent.

**185.** The '910 patent enjoys a presumption of validity.

B.       Plaintiff intends to prove the following contested facts with regard to damages: (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).

**1.** Halo receives commissions from its Hong Kong and Singapore entities for shipments of FastJack products distributed directly from Hong Kong and Singapore.

**2.** Halo owns 50% of Halo Hong Kong.

**3.** Halo owns 40% of Halo Singapore.

**4.** During the period from May 8, 2007 through June 30, 2010 ("the damage period"), Halo produced and/or sold over 2.5 million FastJack products worldwide, earning $5.23 million in revenue.

**5.** Of the $5.23 million in worldwide sales, $4,760,376 was earned by Halo through FastJack products accused of infringing the '910 patent.

**6.** Halo had $2,764,717.35  in sales of infringing FastJack products that were sold to customers with a shipment location of the U.S. during the damages period.

**7.** The amount of infringing sales represents over 90% of Halo's overall FastJack sales during the damage period.

**8.** Halo is responsible for the sales and marketing of Halo's FastJack products in North America, South America, Central America, Europe and Africa.

**9.** FastJack products are shipped directly from Halo's manufacturer in China to customers in to South and Central America, Europe, and Africa.

**10.** The purchase order processing and invoicing for FastJack products shipped directly from China are handled in the U.S. as though Halo made the shipment.

**11.** The entire $4,760,376 is the royalty base in deriving a reasonable royalty damage amount.

**12.** During the damage period, Bel Fuse sold over 97.6 million MagJack units worldwide, earning $284.7 million in revenue.

13. Of the MagJack units sold worldwide by Bel Fuse during the damage period, approximately 8.5 million units were shipped to the U.S., representing $19.3 million in revenue.

14. In 2006, Bel Fuse entered into a license and enforcement agreement for the '910 patent with Pulse Engineering.

15. The 2006 agreement came about because Bel Fuse had, two years prior, accused Pulse of infringing the '910 patent.

16. The 2006 agreement calls for Pulse to notify Bel Fuse of potential infringers and for the parties to split proceeds from settlements with other infringers.

17. The 2006 agreement calls for Pulse to pay Bel Fuse a lump sum royalty payment of $400,000.

18. Plaintiffs are entitled to $400,000 in damages based on the reasonable royalty calculations performed by Plaintiffs' expert on damages, Michele M. Riley.

19. A $400,000 lump sum royalty payment would be adequate to compensate Bel Fuse for Halo's infringing FastJack sales.

20. Plaintiffs submitted a damages expert report from Michele Riley, which establishes that $400,000 is adequate to compensate Bel Fuse for Halo's infringing FastJack sales.

21. In the alternative to a reasonable royalty calculation, Bel Fuse is entitled to lost profits.

22. Halo's infringement of the '910 patent will continue unless enjoined by this Court.

23. Bel Fuse has suffered irreparable injury as a result of Halo's infringement.

24. The remedies available at law are inadequate to compensate for that injury.

25. Considering the balance of hardships between Plaintiffs and Defendant, a remedy in equity is warranted.

26. The public interest would not be disserved by a permanent injunction.

5. DEFENDANT'S CONTESTED FACTS (State separately for each defendant. See instructions above).

   A. Defendant intends to prove the following contested facts with regard to liability.

1. A "modular connector" is a device that connects a transmission wire to a printed electrical circuit board.

2. One example of a modular connector is the RJ-45 Ethernet jack, which connects a device's internal circuitry to the plug of an Ethernet cord.

3.   There are often "noise" signals in the transmission that interfere with the desired signals.

4.   The term "noise" generally refers to the presence of an undesired signal in a particular location.

5.   Reflected waves are a type of noise.  Circuitry can be placed either next to or within the connector to suppress noise.

6.   The '910 patent-in-suit claims a modular connector that establishes an electrical connection between a plug and a main printed circuit board.  The plug has electrical contacts that connect to a first set of contacts in the housing of the connector.

7.   Most of the asserted claims of the '910 patent cover a connector with a particular noise-suppression circuit inside the housing.  That circuit is shown in Figure 7 of the '910 patent includes the various noise suppression circuits in the claims.

8.   The Figure 7 circuit was developed by company called Bay Networks (the entire circuit is referred to as the "Bay Networks circuit").  The Bay Networks circuit includes a set of four resistors, which is often called the Bob Smith termination.

9.   Both "filters" and "terminations" are noise-suppression circuits, and these labels are often used interchangeably.

10.  The Bay Networks circuit is a noise-suppression circuit.

11.  The Bay Networks circuit is a filter.

12.  Bel Fuse and Stewart Connector Systems (the original patent owner) entered into a contract a week before the '910 patent was filed that related to a commercial embodiment of the '910 patent.  The agreement was signed by one of the named inventors on behalf of Stewart.  The agreement includes a schematic diagram of the Bay Networks circuit and refers to the circuit as a "Filter Network."

13.  Bel Fuse and Stewart consistently referred to the Bay Networks circuit as a filter or noise-suppression circuit.

14.  The '910 patent stems from an application filed on November 22, 1995, by employees of Stewart.

15.  The project leading up to the patent began when two of Stewart's named inventors, Robert Brennan and David Hatch, met with one of Stewart's largest customers, Bay Networks, in November 1994.

16.  Bay Networks was having trouble with interference in a circuit board that included a connector and an external circuit for suppressing noise signals.

17.     Bay Networks sought to solve the problem by integrating circuitry on the printed circuit board into the connector.  Mr. Brennan indicated to Bay Networks that Stewart would integrate "whatever circuitry you want to put in there."

18.     Bay Networks, who employed Bob Smith, and communicated to Stewart the specific circuitry to integrate into the connector, which is the circuit shown in Figure 7 of the '910 patent.

19.     Stewart did not design or develop the circuitry shown in Figure 7 of the '910 patent.

20.     Mr. Brennan immediately knew that Stewart could integrate the Bay Networks circuit into a connector.

21.     Another named inventor believed it was obvious that one would want to integrate the circuit that was already next to the connector and that it was no secret what circuit one would have to put in the connector.

22.     On or around November 17, 1994, Bay Networks communicated to one or more of the named inventors, including Robert Brennan, the circuit that Bay Networks wanted to integrate inside a connector.

23.     The circuit disclosed to Mr. Brennan included at least the four resistors and capacitor shown in Figure 7 of the '910 patent.

24.     The communication of the circuit to Mr. Brennan by Bay Networks was not provided under any confidentiality restrictions or a non-disclosure agreement.

25.     Bel Fuse admits that the circuit shown in Figure 7 of the '910 patent was not conceived of by the inventors on the patent.

26.     Bay Networks asked Stewart to work with Bel Fuse to build the circuit and printed circuit board to be integrated inside the connector because it already supplied components for the circuit to Bay Networks.

27.     Bel Fuse executed a non-disclosure agreement with Stewart concerning the integration of the Bay Networks circuit on December 16, 1994.

28.     Stewart executed a non-disclosure agreement with Bay Networks concerning the integration of the Bay Networks circuit on December 30, 1994.

29.     Stewart, Bay Networks, and Bel Fuse held their first joint meeting on the project to integrate the Bay Networks circuit on January 5, 1995.

30.     Several individuals attended the meeting, including Brennan, Hatch, Lee Hill, and Bob Smith.

Case 2:07-cv-02168-GEB -ES   Document 182   Filed 02/10/11   Page 22 of 44 PageID: 6525

31.  During the meeting, the attendees discussed the Bay Networks circuit.  In particular, Bob Smith was communicating the circuit design and the group of individuals from Stewart was listing to Mr. Smith.

32.  Mr. Hill took notes during the January 5 meeting.  Mr. Hill's recorded the Bay Networks circuit provided by Mr. Smith during the January 5 meeting in his notes.

33.  Mr. Hill later redrew and faxed to a named inventor, Peter Townsend, the Bay Networks circuit that he recorded at the meeting.

34.  Mr. Hill admits the circuit from his notes has the same configuration as the one shown in Figure 7 of the '910 patent.

35.  Bel Fuse admits the circuit redrawn and faxed by Mr. Hill was not conceived of by the inventors on the patent.

36.  Stewart and Bel Fuse licensed U.S. Patent No. 5,321,372 from Bay Networks because they could not sell products under the '910 patent without it.  Each company paid Bay Networks $1,000 for the license.

37.  A person of ordinary skill in the art with respect to the '910 patent would have an undergraduate degree or the equivalent in the fields of engineering or related ancillary field and at least three years of experience in electrical connector design and some experience with noise suppression.  Alternatively, a greater length of experience in electrical connector design and application could replace the degree requirement.

38.  To the extent the named inventors conceived of the claimed connectors, the alleged conception could have not occurred until after the Bay Networks circuit was communicated to one or more of the named inventors by individuals at Bay Networks.

39.  The Bay Networks circuit was publicly known by others in this country prior to the named inventors' date of alleged conception of the inventions claimed in the '910 patent.

40.  The Bay Networks circuit shows the level of skill in the art prior to the named inventors' alleged conception of the inventions claimed in the '910 patent.

41.  The Bay Networks was public knowledge at the time it was communicated to the named inventors of the '910 patent.

42.  The Bay Networks circuit had been publicly communicated to Digital Equipment Corporation by at least October 24, 1994.

43.  The Bay Networks circuit is shown in a set of schematics developed by an engineer named Yuval Bachar at DEC by at least October 20, 1994.  The schematic is titled EC-QBTJA-TE (HALO-NJ-0001719-28) (the "DEC Schematic" or "Schematic").

44.  Mr. Bachar did not invent the Bay Networks circuit and believes he learned of the circuit from someone else in the industry, possibly Pulse Engineering.

**45.** Once the Schematic was complete, DEC produced circuit boards and implemented the designs set forth in the schematic diagrams.

**46.** The design in Bay Networks circuit was later published in a December 14, 1994 Application Note ("Connecting the DECchip 21140 PCI Fast Ethernet LAN Controller to the Network: An Application Note," Digital Equipment Corporation, Maynard, Massachusetts, Order Number EC-QAR2A-TE, December 14, 1994 (HALO-NJ-0001511-32)) that DEC distributed to its customers so that they could use the Bay Networks circuit with a DEC product.

**47.** The schematics and notes were intended for distribution to customers, and it was DEC's regular practice to do so.

**48.** The Schematic does not have any confidentiality markings on it and includes a notice that it is protected by a DEC copyright, and thus contained only public information.

**49.** The Schematic was publicly known or used by others in this country before any alleged conception of the inventions claimed in the '910 patent could have occurred.

**50.** The Schematic reflects a prior conception by another before the named inventors' alleged conception of the inventions claimed in the '910 patent.

**51.** The Schematic shows the level of skill in the art before the named inventors' alleged conception of the inventions claimed in the '910 patent.

**52.** The Note was publicly known or used by others in this country before the named inventors' alleged conception of the inventions claimed in the '910 patent.

**53.** The Note reflects a prior conception by another before the named inventors' alleged conception of the inventions claimed in the '910 patent.

**54.** The Note shows the level of skill in the art before the named inventors' alleged conception of the inventions claimed in the '910 patent.

**55.** The integration of noise-suppressing circuit into a modular connector was known before any alleged conception by the named inventors of the '910 patent.

**56.** The integration of circuits that eliminate or suppresses noise signals into a modular connector was known before Stewart met with Bay Networks in November 1994. At that time, many integrated connectors existed.

**57.** One example of an integrated modular connector was Murata's U.S. Patent No. 5,069,641 to Sakamoto.

**58.** Sakamoto taught that incorporating noise suppression circuitry to a modular connector was advantageous because it (1) saves space on the printed circuit board, permitting designers to make electronic devices more compact, (2) can reduce the cost of the overall

device, and (3) eliminates interference between the modular connector and the external noise suppression circuitry.

59. The examiner that allowed the claims of the '910 patent in 1998 never considered the Sakamoto '641 patent or the Bay Networks circuit.

60. Neither the named inventors nor others involved in the prosecution of the '910 patent provided the Sakamoto '641 patent or Bay Networks circuit to the Patent Office.

61. Sakamoto discloses the integration of any noise-suppressing circuit into a connector.

62. Sakamoto was patented in this country prior to the named inventors' alleged conception of the inventions claimed in the '910 patent.

63. Sakamoto was known by others in this country and described in a printed publication in this country prior to the named inventors' alleged conception of the inventions claimed in the '910 patent.

64. Murata sued Bel Fuse for infringement of the Sakamoto patent.

65. Bel Fuse alleges that its MagJack product is covered by the '910 patent.

66. Murata accused  Bel Fuse's MagJack product of infringing the Sakamoto patent.

67. Bel Fuse sought summary judgment that Sakamoto was invalid because the concept of integrating noise-suppression circuitry into a connector was obvious.

68. Bel Fuse relied on two experts to support its invalidity position, Dr. Robert Mroczkowski and Charles Blichasz, and submitted declarations from them to support that motion.

69. Both experts have proffered opinions on behalf of Halo that are consistent with the opinions expressed on behalf of Bel Fuse in the litigation with Murata.

70. Bel Fuse licensed the Sakamoto patent for $2.1 million.

71. The connectors claimed in the '910 patent all suppress noise.

72. A Bob Smith termination circuit suppresses noise.

73. "ATM Physical Medium Dependent Interface Specification for 155 Mb/s over Twisted Pair Cable," The ATM Forum Technical Committee, af-phy-0015.000, September 1994 (HALO-NJ-0001480-1503) ("ATM Specification") was publicly known or used by others in this country before the named inventors' alleged conception of the inventions claimed in the '910 patent.

74. The ATM Specification was described in a printed publication in this country before the named inventors' alleged conception of the inventions claimed in the '910 patent.

75. The ATM Specification shows the level of skill in the art before the named inventors' alleged conception of the inventions claimed in the '910 patent.

76. U.S. Patent No. 4,789,847 was patented in this country before the named inventors' alleged conception of the inventions claimed in the '910 patent.

77. U.S. Patent No. 4,789,847 was known by others in this country and described in a printed publication in this country prior to the named inventors' alleged conception of the inventions claimed in the '910 patent.

78. U.S. Patent No. 5,587,884 was granted on an application filed in this country before the named inventors' alleged conception of the inventions claimed in the '910 patent.

79. U.S. Patent No. 5,587,884 was known by others in this country prior to the named inventors' alleged conception of the inventions claimed in the '910 patent.

80. U.S. Patent No. 5,587,884 shows the level of skill in the art prior to the named inventors' alleged conception of the inventions claimed in the '910 patent.

81. The electrical circuit, which is referenced in a facsimile from R. Jacobs to Lee Hill dated November 17, 1994 (HILL000901-902), was communicated to Robert Brennan and David Hatch by individuals at Bay Networks.

82. The electrical circuit communicated to Robert Brennan and David Hatch by Bay Networks, which is referenced in a facsimile from R. Jacobs to Lee Hill dated November 17, 1994 (HILL000901-902), is prior art to the '910 patent under 35 U.S.C. § 102(f).

83. The electrical circuit communicated to Robert Brennan and David Hatch by Bay Networks, which is referenced in a facsimile from R. Jacobs to Lee Hill dated November 17, 1994 (HILL000901-902), is prior art to the '910 patent under 35 U.S.C. § 102(a).

84. The electrical circuit communicated to Robert Brennan and David Hatch by Bay Networks, which is referenced in a facsimile from R. Jacobs to Lee Hill dated November 17, 1994 (HILL000901-902), is prior art to the '910 patent under 35 U.S.C. § 102(b).

85. The electrical circuit, which is referenced in notes from Lee Hill (HILL000723), was communicated to the named inventors by Bay Networks.

86. The electrical circuit communicated to the named inventors by individuals at Bay Networks, which is referenced in notes from Lee Hill (HILL000723), is prior art to the '910 patent under 35 U.S.C. § 102(f).

87. The electrical circuit communicated to the named inventors by Bay Networks, which is referenced in notes from Lee Hill (HILL000723), is prior art to the '910 patent under 35 U.S.C. § 102(a).

88. The electrical circuit, which is referenced in the facsimile from Lee Hill to Peter Townsend regarding "Bel Common Mode Filter/Transformer" dated January 23, 1995

with attached Schematic dated January 5, 1995 (BF006141-42), was communicated to the named inventors by individuals at Bay Networks.

89.    The electrical circuit communicated to the named inventors by Bay Networks, which is referenced in the facsimile from Lee Hill to Peter Townsend regarding "Bel Common Mode Filter/Transformer" dated January 23, 1995 with attached Schematic dated January 5, 1995 (BF006141-42), is prior art to the '910 patent under 35 U.S.C. § 102(f).

90.    The electrical circuit communicated to the named inventors by Bay Networks, which is referenced in the facsimile from Lee Hill to Peter Townsend regarding "Bel Common Mode Filter/Transformer" dated January 23, 1995 with attached Schematic dated January 5, 1995 (BF006141-42), is prior art to the '910 patent under 35 U.S.C. § 102(a).

91.    The Bay Networks Transformer Part No. 330-025 is prior art to the '910 patent under 35 U.S.C. § 102(a).

92.    The Bay Networks Transformer Part No. 330-025 is prior art to the '910 patent under 35 U.S.C. § 102(b).

93.    The Bay Networks Transformer Part No. 330-025 is prior art to the '910 patent under 35 U.S.C. § 102(f).

94.    The Evaluation Board Schematic for DEC chip 21140, document number EC-QBTJA-TE, dated October 20, 1994 (HALO-NJ-0001719-28) reflects public knowledge, a prior conception by another, or is otherwise prior art to the '910 patent under 35 U.S.C. § 102(a).

95.    The Evaluation Board Schematic for DEC chip 21140, document number EC-QBTJA-TE, dated October 20, 1994 (HALO-NJ-0001719-28) reflects public knowledge, a prior conception by another, or is otherwise prior art to the '910 patent under 35 U.S.C. § 102(b).

96.    The Evaluation Board Schematic for DEC chip 21140, document number EC-QBTJA-TE, dated October 20, 1994 (HALO-NJ-0001719-28) reflects public knowledge, a prior conception by another, or is otherwise prior art to the '910 patent under 35 U.S.C. § 102(g)(2).

97.    "Connecting the DECchip 21140 PCI Fast Ethernet LAN Controller to the Network: An Application Note," Digital Equipment Corporation, Maynard, Massachusetts, Order Number EC-QAR2A-TE, December 14, 1994 (HALO-NJ-0001511-32) reflects public knowledge, a prior conception by another, or is otherwise prior art to the '910 patent under 35 U.S.C. § 102(a).

98.    "Connecting the DECchip 21140 PCI Fast Ethernet LAN Controller to the Network: An Application Note," Digital Equipment Corporation, Maynard, Massachusetts, Order Number EC-QAR2A-TE, December 14, 1994 (HALO-NJ-0001511-32) reflects public knowledge, a prior conception by another, or is otherwise prior art to the '910 patent under 35 U.S.C. § 102(g)(2).

99.    The "ATM Physical Medium Dependent Interface Specification for 155 Mb/s over Twisted Pair Cable," The ATM Forum Technical Committee, af-phy-0015.000, September 1994 (HALO-NJ-0001480-1503) is prior art to the '910 patent under 35 U.S.C. § 102(a).

100.   The "ATM Physical Medium Dependent Interface Specification for 155 Mb/s over Twisted Pair Cable," The ATM Forum Technical Committee, af-phy-0015.000, September 1994 (HALO-NJ-0001480-1503) is prior art to the '910 patent under 35 U.S.C. § 102 (b).

101.   The differences between the prior art and the asserted claims are minimal.

102.   Each limitation of each of the asserted claims was known in the prior art before the time of invention of the '910 patent. The prior art disclosed modular connectors for mounting on a printed circuit board with noise-suppression circuitry, including a capacitor, incorporated into the modular connector. In addition, the prior art disclosed the Bay Networks circuit used in conjunction with a shielded RJ-45 modular connector but located next to it, with everything to be implemented by mounting on a printed circuit board.

103.   There were many reasons, such as those discussed above, that would motivate one of ordinary skill in the art to modify the prior art to incorporate the Bay Networks circuit into a shielded RJ-45 jack, just as other noise-suppression circuitry had previously been incorporated into modular connectors. In addition, one of ordinary skill in the art would reasonably expect success incorporating noise filtering circuitry into modular connectors (as it had been done by other companies in the past), and there was market pressure to do so, as is evident from Bay Networks's request that Stewart incorporate the Bay Networks circuit into the jack that Stewart was selling them at the time.

104.   One of ordinary skill in the art at the time of the invention would not have thought there would be a problem fitting the Bay Networks circuitry inside a connector.

105.   One of ordinary skill in the art at the time of the invention would not have thought that integrating the Bay Networks circuitry into a connector would create the risk of cross-talk, increased attenuation, or any other problem with the electrical performance of the connector or integrated circuitry.

106.   One of ordinary skill in the art at the time of the invention would not have thought that integrating the Bay Networks circuitry into a connector would be difficult in light of the industry upgrade to Category 5 networks.

107.   One of ordinary skill in the art at the time of the invention would not have thought of any other reasons not to integrate the Bay Networks circuitry into a modular connector.

108.   There was a strong motivation to combine the teachings in Sakamoto with the Bay Networks Circuit, DEC Schematic, or DEC Note.

109. Claims 11-13 and 17-22 of the '910 patent would have been obvious at the time the alleged invention was made to one of ordinary skill in the art in light of Sakamoto and the Bay Networks Circuit.

110. Claims 11-13 and 17-22 of the '910 patent would have been obvious at the time the alleged invention was made to one of ordinary skill in the art in light of Sakamoto and the DEC Note.

111. Claims 11-13 and 17-22 of the '910 patent would have been obvious at the time the alleged invention was made to one of ordinary skill in the art in light of Sakamoto and the DEC Schematic.

112. Claims 11-13 and 17-22 of the '910 patent would have been obvious at the time the alleged invention was made to one of ordinary skill in the art in light of Sakamoto, the DEC Schematic, and the DEC Note.

113. Claims 11-13 and 17-22 of the '910 patent would have been obvious at the time the alleged invention was made to one of ordinary skill in the art in light of Sakamoto, the DEC Schematic, the DEC Note, and/or the Bay Networks Circuit.

114. The combinations of elements found in claims 11-13 and 17-22 constitute no more than the predictable use of prior art elements according to their established functions, and therefore any combination of Sakamoto, the DEC Schematic, the DEC Note, the Bay Networks Circuit, the ATM Specification, U.S. Patent No. 4,789,847, and/or U.S. Patent No. 5,587,884 that includes all the limitations of a given claim would render the claim obvious.

115. Bel Fuse's allegations regarding secondary considerations of non-obviousness do not overcome the other strong evidence of obviousness.

116. There is no nexus between practicing the asserted claims and success from a commercial, manufacturing, or performance perspective.

117. Bel Fuse has made no showing that the products actually practice the asserted claims.

118. Bel Fuse presents no evidence that integration of the Bay Networks circuit in particular, as opposed to just practicing the Sakamoto patent, is responsible for any alleged benefits.

119. The integration taught by the Sakamoto patent is responsible for any commercial success enjoyed by the Bel Fuse products.

120. The '910 patent did not satisfy a "long-felt need" that others failed to meet.

121. The idea of putting noise suppressing circuitry into the connector had already been arrived at by Sakamoto.  The named inventors applied the teachings of Sakamoto to meet a particular customer's request, using circuitry communicated by the customer.

122. Halo appreciates the need for integrated connectors and therefore obtained a license to Sakamoto to permit it to meet this need.

123. The Pulse license of the '910 patent does not support non-obviousness because there is no nexus between the value of the patent and the license.

124. The '910 patent discloses to one of ordinary skill in the art that its inventive contribution is the use of a "flexible capacitor" as part of the Bay Networks Circuit.

125. The patent identifies its goal as a connector with an integrated capacitor that is small enough to be integrated into an industry standard connector yet still be able to eliminate noise.

126. The patent criticizes prior art connectors with an integrated ceramic capacitor because it was allegedly impossible to increase the ceramic capacitor's capacitance—and thus its ability to eliminate noise—without increasing its size.

127. According to the '910 patent, increasing the capacitor's size would require a larger connector, which would consume valuable circuit board space.

128. The '910 patent gives only one example of a capacitor that fulfills its stated objectives—the flexible capacitor.

129. Every figure that depicts a capacitor shows the flexible capacitor.

130. Every embodiment in the '910 patent includes a flexible capacitor.

131. The '910 patent's title is "Modular Jack Connector with a Flexible Laminate Capacitor Mounted on a Circuit Board."

132. All the claims in the original application were limited to flexible capacitors.

133. The Patent Office changed the title of the patent to reference flexible capacitors.

134. Stewart initially tried to use the flexible capacitor for its commercial MagJack product.

135. In July 1996, Stewart it concluded the flexible capacitor had proven to be a manufacturing nightmare.

136. After learning of the failure of the flexible capacitor, Stewart and its lawyers added claims to the '910 patent that, as construed, cover any type of capacitor.

137. The '910 patent specification does not describe the manner and process of making and using the invention so as to enable a person of skill in the art to make and use the full scope of the invention without undue experimentation.

138. The '910 patent specification does not describe the invention sufficiently to convey to a person of skill in the art that the named inventors had possession of the claimed invention at the time of the application.

**139.**    Claims 11-13 and 17-22 fail to comply with the written description requirement.

**140.**    During a joint development meeting in February 1995, Mr. Hatch recalls that Bel Fuse's Johnny Chen proposed using a discrete, ceramic capacitor in the connector.

**141.**    The development team for the MagJack decided to use the Chen capacitor in the design at that time.

**142.**    Mr. Hatch preferred the Chen capacitor to the flexible capacitor.

**143.**    Mr. Brennan thinks the flexible capacitor was chosen for the MagJack, despite its problems, so the resulting product would potentially be patentable.

**144.**    Although Mr. Hatch preferred the Chen capacitor before filing, the '910 patent does not disclose the Chen capacitor.

**145.**    Mr. Hatch had a best mode other than the flexible capacitor at the time of filing the application that resulted in the '910 patent.

**146.**    The '910 patent does not disclose the Chen capacitor to one of ordinary skill in the art.

**147.**    The '910 patent fails to comply with the best mode requirement.

**148.**    The named inventors of the '910 patent, the attorneys/agents who prosecuted the patent application that issued as the '910 patent and the reexamination proceedings of the '910 patent, any individuals that submitted a declaration that was intended to secure allowance of the claims, and Bel Fuse intentionally deceived the Patent Office during the prosecution and reexamination proceedings of the '910 patent by withholding material information and by making material misstatements regarding the work done and contributions made by others.  This information concerns inventorship and prior art to the '910 patent, and therefore was highly material to the patentability of the '910 patent claims.

**149.**    Martin G. Raskin, Clifford M. Davidson, and Cary S. Kappel prosecuted the original '910 patent application and were admitted to practice before that Patent and Trademark Office. As a result, those individuals and the applicants were subject to the duty of candor and good faith in their dealings with the Patent Office.

**150.**    The examiner during the original '910 patent prosecution was never told that the named inventors did not conceive of the Bay Networks circuit (depicted in Figure 7 of the patent), that a customer suggested using the circuit, or that the Bay Networks Circuit and Figure 7 of the '910 patent were in fact prior art to the '910 patent.

**151.**    This information was knowingly withheld from and misrepresented to the Patent Office by named inventors of the '910 patent and the attorneys/agents who prosecuted the patent application that issued as the '910 patent with an intent to deceive the Patent Office into granting an invalid patent that did not satisfy the standards of patentability.

152. After Bel Fuse filed this lawsuit, Halo initiated an *ex parte* reexamination, to bring a document reflecting the Bay Networks circuit (the DEC Note), along with other prior art, to the Patent Office's attention.

153. A few months after Halo filed its reexamination request, Martin G. Raskin applied for admission *pro hac vice* in this matter.  The application was eventually granted and Martin G. Raskin became trial counsel in this matter.

154. Martin G. Raskin and Joshua Raskin prosecuted the reexamination proceedings of the '910 patent before that Patent Office.  As a result, those individuals along with Bel Fuse and the named inventors were subject to the duty of candor and good faith in their dealings with the Patent Office.  Joshua Raskin was also trial counsel for Bel Fuse in this litigation.

155. As trial counsel, Martin G. Raskin and Joshua Raskin attended the depositions of the named inventors and Lee Hill, and were therefore aware of the communication of the Bay Networks circuit to the named inventors.

156. The Patent Office rejected the '910 claims in light of the Bay Networks circuit shown in the DEC Note and other art.

157. In response, Bel Fuse never contested that it would have been obvious to integrate the Bay Networks circuit into a modular connector.

158. Instead, Bel Fuse submitted a declaration from the still-living named inventors alleging the asserted claims "were conceived prior to December 14, 1994," which is the publication date of the DEC Note.

159. The earliest document submitted by Bel Fuse to allege conception, however, was Lee Hill's drawing of the Bay Networks circuit that was copied from notes he took at the January 5 meeting where Bay Networks communicated the circuit to the inventors.

160. Bel Fuse and its attorneys never told the Patent Office that the named inventors of the '910 patent did not conceive of the Bay Networks circuit or that Mr. Hill's drawing reflected information that had been communicated to the named inventors by someone else.

161. Thus, Bel Fuse alleged conception before one piece of prior art (the DEC Note) by using a second piece of prior art (the January 5 fax) without telling the Patent Office the information it needed to realize the second item was prior art.

162. Lacking the information that Martin G. Raskin, Joshua Raskin,  any individuals that submitted a declaration that was intended to secure allowance of the claims, Bel Fuse, and the named inventors should have disclosed, the Patent Office found the circuit was not prior art and withdrew its rejection.

163.    This information concerns not only the proper inventorship and priority date of the '910 patent claims, but it also constitutes prior art to the '910 patent. Thus, the withheld and misrepresented information was highly material to the patentability of the '910 patent.

164.    The information set forth in the preceding paragraphs was knowingly withheld from and misrepresented to the Patent Office by Martin G. Raskin, Joshua Raskin, any individuals that submitted a declaration that was intended to secure allowance of the claims, Bel Fuse, and the named inventors with an intent to deceive the Patent Office into granting an invalid patent and reexamination certificate that did not satisfy the standards of patentability.

165.    No one at Halo actually knew of the existence of the '910 patent until May, 2007 (i.e., when Bel Fuse served the complaint in this matter), much less considered that patent in connection with any activities involving the accused products.

166.    Halo did not learn of any accusation that Halo infringed the '910 patent until May, 2007.

167.    Halo did not act despite an objectively high likelihood that its actions constituted infringement of any valid claim of the '910 patent. Further, any risk of such infringement was unknown and not obvious to Halo.

168.    Bel Fuse is not entitled to a permanent injunction.

169.    Based on the facts described above, Halo should be awarded its reasonable attorneys' fees and costs.

170.    To the extent that any issue of law listed below may be considered a factual contention, it is incorporated here by reference.

B.      Defendant intends to prove the following contested facts with regard to damages. (This statement must include the factual basis for each defense against plaintiff's claims for damages).

1.      Halo entered a Stipulation on January 24, 2011 (Doc. No. 165).

2.      At least as early as 2002, Halo first offered for sale or sold within the United States, or imported into the United States products identified in Exhibit B to the January 24, 2011 Stipulation (Doc. No. 165).

3.      Bel Fuse did not mark its products before it filed this case in May 2007.

4.      Bel Fuse cannot recover any alleged damages before May 2007 because of its failure to mark.

5.      Bel Fuse has not accused any transactions concerning Subgroups 2 through 7 (as described in Doc. No. 158) of infringement.

6.      Halo and Halo Hong Kong are different legal entities.

7.     Halo and Halo Singapore are different legal entities.

8.     Halo Singapore and Halo Hong Kong have not been named parties to the present lawsuit and have not been accused by Bel Fuse of infringing any claim of the '910 patent.

9.     Halo is not responsible for the activities of Halo Hong Kong or Halo Singapore.

10.     The reasonable royalty calculations performed by Plaintiffs' expert on damages, Michele M. Riley, are neither relevant nor reliable.

11.     Bel Fuse seeks to recover an amount from Halo that is not a direct and proximate result of Halo's alleged infringement.

12.     Bel Fuse acquired the assets of Stewart, including the '910 patent, out of bankruptcy sale on March 22, 2003.

13.     On April 10, 2006, Bel Fuse entered into a license and enforcement agreement for the '910 patent with Pulse Engineering. The Pulse license does not support the royalty rate that Bel Fuse seeks from Halo.

14.     The 2006 agreement calls for the parties to split proceeds from settlements with other infringers.

15.     The 2006 agreement calls for Pulse to pay Bel Fuse a lump sum royalty payment of $400,000.

16.     Pulse contested the validity of the '910 patent during negotiations, and nothing shows it changed its mind rather than taking the license as a nuisance settlement.

17.     Pulse's decision to include a provision that allowed it to enforce the patent and split the proceeds was to ensure it was not at a disadvantage relative to competitors.

18.     Pulse's revenue for products covered by the '910 patent license that were shipped or imported by Pulse into the United States from 1999 through 2005 was approximately 20 million dollars.

19.     Pulse's forecasted revenue for products covered by the '910 patent license that were shipped or imported by Pulse into the United States from 2006 through 2015 was approximately 60 million dollars.

20.     The rates paid by or to Bel Fuse for the use of other patents comparable to the '910 patent do not support the royalty that Bel Fuse seeks from Halo for its alleged infringement of the claims of the '910 patent.

21.     The rates paid by Halo for the use of other patents comparable to the '910 patent does not support the royalty that Bel Fuse seeks from Halo for its alleged infringement of the claims of the '910 patent.

**22.**    The *Georgia Pacific* factors do not support the royalty that Bel Fuse seeks from Halo for its alleged infringement of the claims of the '910 patent.

**23.**    Bel Fuse is not entitled to lost profits.

6.    PLAINTIFF'S WITNESSES (Aside from those called for impeachment purposes, only those witnesses whose names and addresses are listed below will be permitted to testify at trial).

A.    On liability, plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

**1)    Leslie A. Baxter**
Home Address: 154 Pinckney Road, Little Silver, NJ 07739
Business Address:  Baxter Enterprises, 154 Pinckney Road, Little Silver, NJ 07739
    Summary: Mr. Baxter will testify as to matters regarding the validity of the patent-in-suit, in accordance with his Rebuttal Expert Report dated January 14, 2011.

**2)    Peter G. Bittner, III**
Home Address:  1803 Pin Oak Drive, Spring Grove, PA 17362
Business Address:  Stewart Connector, 11118 Susquehanna Trail South, Glen Rock, PA 17327
    Summary: Mr. Bittner will testify as to matters regarding the corporate identity of the Plaintiffs, document authentication and the development and commercial success of the MagJack® product, including, but not limited to: the acquisition of Stewart by Bel Fuse; the design, manufacture and sale of the MagJack® product; the advantages of the MagJack® product and integrated connector modules ("ICMs") in general; the use the Bob Smith termination circuit in the MagJack® product; the identity of Bel Fuse's customers; customer demands and expectations with respect to ICMs; patent licenses granted by and to Bel Fuse; competitors in the ICM market; Bel Fuse's market share; and others' adoption of the technology disclosed in the patent-in-suit.

**3)    Jeffrey R. Heaton**
Home Address:  (unknown)
Business Address:  Halo Electronics, Inc., 1861 Landings Drive, Mountain View, CA 94043
    Summary: Mr. Heaton will be called upon to testify as to matters regarding document authentication and evidence of secondary considerations of nonobviousness, including, but not limited to: the design, manufacture, and sale of Halo's FastJack™ product; and the advantages of integrated connectors and the Bob Smith termination circuit.

**4)    Robert J. Brennan**
Home Address:  1530 Kentwood Lane, York, PA 17403
Business Address:  Sentinel Connector Systems Inc., 1953 Stanton Street, York, PA 17404
    Summary: Mr. Brennan will testify as to matters regarding the conception and development of the MagJack® product, including, but not limited to, advances made by the technology disclosed in the patent-in-suit; a technical problem expressed by Synoptics/Bay

34

Networks; Mr. Brennan's solution to the problem; meetings with Synoptics/Bay Networks; and obstacles encountered and overcome during the development of the MagJack®, including with respect to the flexible capacitor.

*Plaintiffs do not currently intend to call this witness.*

**5)    David A. Hatch**
Home Address:  203 Monomoscoy Road, Mashpee, MA
Business Address:  Cobra Cable Tie Co., 30 Main Street, Ashland, MA 01721
Summary:  Mr. Hatch will testify as to matters regarding the best mode of practicing the patent-in-suit, including, but not limited to: obstacles encountered and overcome during the development of the MagJack®, including with respect to the flexible capacitor; and the continuing development of the flexible capacitor until after the application for the patent-in-suit was filed.

*Plaintiffs do not currently intend to call this witness.*

**6)    R. Lee Hill**
Home Address:  20 Patch Road, Hollis, NH 03049
Business Address:  Silent Solutions, 10 Northern Boulevard, Suite 1, Amherst, NH 03031
Summary:  Mr. Hill will be called upon to assist the jury in understanding the technical elements of the invention disclosed in the patent-in-suit, and how those elements function.

*Plaintiffs do not currently intend to call this witness.*

B.      On damages plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

**1)    Michele M. Riley, CPA/CFF, CFE, MBA**
Home Address:  (unknown)
Business Address:  Invotex Group, 1637 Thames Street, Baltimore, MD 21231
Summary:  Ms. Riley will testify as to matters regarding damages in accordance with her Expert Report dated December 17, 2010.

C.      Defendant objects to the following witnesses for the reasons stated:

**Objection to Ms. Riley.**  *See* **Defendant's Contemplated Motion** *in Limine* **to Preclude the Testimony of Ms. Riley.**

7.    DEFENDANT'S WITNESSES (See instructions above).
A.      On liability, defendant intends to call the following witnesses who will testify in accordance with the following summaries:

**1)    Charles S. Blichasz**
Home Address:  652 Deer Road, Boiling Springs, PA  17007-9645
Business Address:  connNtext associates, 652 Deer Road, Boiling Springs, PA  17007-9645

Summary: Mr. Blichasz will testify as to matters regarding the invalidity of the patent-in-suit, in accordance with his Expert Report dated December 17, 2011 and deposition in this matter, and past testimony and/or expert opinions from the Murata litigation.

**2)     Dr. Robert S. Mroczkowski**
Home Address: 920 46th Avenue, Vero Beach, FL  32966
Business Address:  Waypoint Consulting Group, Inc., 920 46th Avenue, Vero Beach, FL  32966
Summary: Dr. Mroczkowski will testify as to matters regarding the invalidity of the patent-in-suit, in accordance with his Expert Report dated December 17, 2011 and deposition in this matter, and past testimony and/or expert opinions from the Murata litigation.

**3)     Jeffrey Heaton**
Home Address: 19832 Rodrigues, Cupertino, CA 95014
Business Address: 1861 Lands Drive, Mountain View, CA 94043
Summary: Mr. Heaton will testify as to matters regarding Halo, including its corporate identity; document authentication; the relationship between the parties and the various lawsuits between them; the development and sale of the accused Halo products; the '910 patent and technology disclosed therein; the design, manufacture and sale of the accused products; the integrated connector module ("ICM") industry; the integration of noise suppression circuitry into connectors; customer demands and expectations with respect to ICMs; competitors in the ICM market; and market share.

**4)     Robert J. Brennan**
Home Address: 1530 Kentwood Lane, York, PA 17403
Business Address:  Sentinel Connector Systems Inc., 1953 Stanton Street, York, PA 17404
Summary: Mr. Brennan will testify as to matters regarding the alleged conception and reduction to practice of the inventions of the claims of the '910 patent, written description and the best mode of practicing the patent-in-suit, including but not limited to the development of the MagJack product, the technology disclosed in the patent-in-suit; meetings and discussions with Synoptics/Bay Networks/Bel Fuse; the flexible capacitor in the MagJack; and prosecution and reexamination of the patent-in-suit.

**5)     David A. Hatch**
Home Address: 203 Monomoscoy Road, Mashpee, MA
Business Address:  Cobra Cable Tie Co., 30 Main Street, Ashland, MA 01721
Summary: Mr. Hatch will testify as to matters regarding the alleged conception and reduction to practice of the inventions of the claims of the '910 patent; the development of the MagJack, including the involvement of Bel Fuse and Bay Networks; the '910 patent and its disclosure; the prosecution and reexamination of the '910 patent; the best mode of practicing the patent-in-suit; background information relating to Stewart Connector Systems.

**6)     R. Lee Hill**
Home Address: 20 Patch Road, Hollis, NH 03049
Business Address:  Silent Solutions, 10 Northern Boulevard, Suite 1, Amherst, NH 03031

Summary: Mr. Hill will testify as to matters regarding the alleged conception and reduction to practice of the inventions of the claims of the '910 patent; the development of the MagJack, including the involvement of Bel Fuse and Bay Networks; the '910 patent and its disclosure; technical elements of the invention disclosed in the patent-in-suit; and past testimony and/or expert opinions from the Murata litigation.

B.      On damages defendant intends to call the following witnesses who will testify in accordance with the following summaries:

**1)      Jeffrey Heaton**
Home Address: 19832 Rodrigues, Cupertino, CA 95014
Business Address: 1861 Lands Drive, Mountain View, CA 94043
Summary: Mr. Heaton will testify as to matters regarding the sale of the accused Halo products, competitors in the ICM market, market share in the industry, patent licensing in the industry, and patent licenses or other agreements entered into by Halo and/or Bel Fuse.

C.      Plaintiff objects to the following witnesses for the reasons stated:

**Objection to Messrs. Blichasz and Mroczkowski.** *See* **Plaintiffs' Contemplated Motion in Limine to Preclude the Testimony of Mroczkowski and/or Blichasz. Plaintiffs also object to the proposed testimony of Messrs. Blichasz and Mroczkowski to the extent it will include testimony regarding issues not addressed in their expert reports, such as testimony from their depositions in this matter, past testimony and/or expert opinions from the Murata litigation.** *See* **Plaintiffs' Contemplated Motion in Limine to Preclude Halo's Experts from Testifying on Matters Not Disclosed in their Expert Reports.**

8.      EXPERT WITNESSES (No opposing counsel shall be permitted to question the expert's qualifications unless the basis of an objection is set forth herein).

A.      Plaintiff's expert witnesses are:

**1)      Leslie A. Baxter (*see* curriculum vitae, attached hereto as Exhibit 1)**
**2)      Michele M. Riley, CPA/CFF, CFE, MBA (*see* curriculum vitae, attached hereto as Exhibit 2)**

B.      Defendant's objections to the qualifications of plaintiff's expert are:

**None.**

C.      Defendant's expert witnesses are:

**1)      Charles S. Blichasz (*see* curriculum vitae, attached hereto as Exhibit 3)**
**2)      Dr. Robert S. Mroczkowski (*see* curriculum vitae, attached hereto as Exhibit 4)**

D.      Plaintiff's objections to the qualifications of defendant's experts are:

**None.**

9.     PLAINTIFF'S EXHIBITS (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made).

       A.     Plaintiff intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):

       **See Exhibit 5, attached hereto.**

       B.     Defendant objects to the introduction of plaintiff's exhibits (set forth number of an exhibit and grounds for objection):

       **See Exhibit 5, attached hereto.**

10.    DEFENDANT'S EXHIBITS (See instructions above).

       A.     Defendant intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):

       **See Exhibit 6, attached hereto.**

       B.     Plaintiff objects to the introduction of defendant's exhibits (set forth number of exhibit and grounds for objection):

       **See key below and Exhibit 6, attached hereto.**

| Code | Objection |
|------|-----------|
| 106  | Incomplete.  This exhibit is objectionable because it is incomplete and the introduction of the remaining portions ought, in fairness, to be contemporaneously with it (FRE 106). |
| 402  | Relevance.  This exhibit is objectionable because it is not relevant (FRE 402) |
| 403  | Prejudicial/Misleading/Confusion of Issues/Waste of Time/Cumulative.  The exhibit is objectionable because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury or by considerations of undue delay, waste of time or needless presentation of cumulative evidence  (FRE 403). |
| 408  | Compromise or Offer to Compromise.  This exhibit is objectionable because it relates to offers to compromise and/or settlement negotiations (FRE 408). |

Case 2:07-cv-02168-GEB -ES   Document 182   Filed 02/10/11   Page 39 of 44 PageID: 6542

| 602 | Personal Knowledge.  This exhibit is objectionable because it constitutes testimony on a matter as to which the witness lacks personal knowledge (FRE 602). |
|-----|---------------------------------------------------------------------------------------------------------------------------------------------------------|
| 701 | Lay Opinion/Legal Conclusion.  This exhibit is objectionable because it constitutes opinion testimony by a lay witness that is not reasonably based on perception and helpful to a clear understanding of the witness' testimony or determination of a fact in dispute (FRE 701). |
| 801 | Hearsay.  This exhibit is objectionable because it is a statement made by one other than the declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted and not subject to any hearsay objection (FRE 801 and 802). |
| 901 | Authentication.  This exhibit is objectionable because it has not been properly authenticated (FRE 901). |
| 1001 | Best Evidence.  This exhibit is objectionable because it is vague and ambiguous as to whether the witness is summarizing his/her own independent understandings or the contents of a document.  If the latter, attempt to prove content of a document with secondary evidence.  (FRE 1001 – 1004) |
| 37 | Failure to Disclose.  This exhibit is objectionable because  it was not disclosed to defendants in a timely manner  (FRCP 37(c)). |
| A/C | Privilege.  Attorney/Client Privilege and/or Work Product Immunity. |
| E | This exhibit is objectionable because it constitutes attempted expert testimony from a person who was not designated as an expert and who did not submit an expert report (FRCP 26). |
| F | This exhibit is objectionable because it lacks foundation. |

(Copies of exhibits are to be made for opposing counsel, and a bench book of exhibits is to be delivered to the Judge at the start of trial. If counsel desires to display exhibits to the jury, sufficient copies should be available to provide each juror with a copy; alternatively, enlarged photographic or projected copies may be used).

11.    PLAINTIFF'S LEGAL ISSUES

1.    **Whether $400,000, at a minimum, is an amount adequate to compensate Plaintiffs for damages sustained from Halo's admitted acts of infringement of the asserted claims of the patent in suit, and whether that amount should be trebled pursuant to 35 U.S.C. § 284.**

2.    **Whether Plaintiffs are entitled to an order, pursuant to 35 U.S.C. § 283, permanently enjoining and restraining Halo from continuing to infringe, and from**

contributing to and/or inducing its infringement of, any asserted claims of the patent in suit.

3.     Whether Plaintiffs are entitled to an order, pursuant to 35 U.S.C. § 285, that Halo pay Plaintiffs their reasonable attorneys' fees in connection with this action.

4.     Whether Plaintiffs are entitled to a judgment that costs of this action be awarded to Plaintiffs.

5.     Whether Plaintiffs are entitled to an order that Halo pay Plaintiffs prejudgment and post-judgment interest at the highest statutory rate on Plaintiffs' damages, costs and attorneys' fees.

6.     Whether Plaintiffs are entitled to an order awarding Plaintiffs such other and further relief as may be deemed by this Court to be just and proper.

7.     Whether the USPTO correctly concluded that the inventions of the asserted claims of the patent in suit were conceived prior to December 14, 1994, reduced to practice by February 8, 1995, and that there was proper diligence between those dates.

12.     DEFENDANT'S LEGAL ISSUES

1.     Whether claims 11-13 and 17-22 of the '910 patent are invalid as obvious under 35 U.S.C. § 103.

2.     Whether claims 11-13 and 17-22 of the '910 patent are invalid for failure to satisfy the best mode requirement of 35 U.S.C. § 112.

3.     Whether claims 11-13 and 17-22 of the '910 patent are invalid for failure to satisfy the written description requirement of 35 U.S.C. § 112.

4.     Whether claims 11-13 and 17-22 of the '910 patent are invalid for failure to failure to name the proper inventors under 35 U.S.C. § 102(f).

5.     Whether the '910 patent is unenforceable due to inequitable conduct.

6.     Whether Halo should be awarded reasonable attorneys' fees and costs under 35 U.S.C. § 285 and/or 28 U.S.C. § 1927.

7.     Whether the electrical circuit communicated to Robert Brennan and David Hatch by Bay Networks, which is referenced in a facsimile from R. Jacobs to Lee Hill dated November 17, 1994 (HILL000901-902), is prior art to the '910 patent under 35 U.S.C. § 102(a), (b), or (f).

8.     Whether the electrical circuit communicated to the named inventors by Bay Networks, which is referenced in notes from Lee Hill (HILL000723), is prior art to the '910 patent under 35 U.S.C. § 102(a) or (f).

9.     Whether the electrical circuit communicated to the named inventors by Bay Networks, which is referenced in the facsimile from Lee Hill to Peter Townsend regarding "Bel Common Mode Filter/Transformer" dated January 23, 1995 with

> attached Schematic dated January 5, 1995 (BF006141-42), is prior art to the '910 patent under 35 U.S.C. § 102(a) or (f).

10.     Whether Bay Networks Transformer Part No. 330-025 is prior art to the '910 patent under 35 U.S.C. § 102(a), (b), or (f).

11.     Whether the Evaluation Board Schematic for DEC chip 21140, document number EC-QBTJA-TE, published October 20, 1994 (HALO-NJ-0001719-28) reflects public knowledge, a prior conception by another, or is otherwise prior art to the '910 patent under 35 U.S.C. § 102(a), (b), and (g)(2).

12.     Whether "Connecting the DECchip 21140 PCI Fast Ethernet LAN Controller to the Network: An Application Note," Digital Equipment Corporation, Maynard, Massachusetts, Order Number EC-QAR2A-TE, December 14, 1994 (HALO-NJ-0001511-32) reflects public knowledge, a prior conception by another, or is otherwise prior art to the '910 patent under 35 U.S.C. § 102(a) and (g)(2).

13.     Whether the "ATM Physical Medium Dependent Interface Specification for 155 Mb/s over Twisted Pair Cable," The ATM Forum Technical Committee, af-phy-0015.000, September 1994 (HALO-NJ-0001480-1503) is prior art to the '910 patent under 35 U.S.C. § 102(a) and (b).

14.     Whether U.S. Patent No. 5,069,641 is prior art to the '910 patent under 35 U.S.C. § 102(a) or (b).

15.     Whether U.S. Patent No. 4,789,847 is prior art to the '910 patent under 35 U.S.C. § 102(a) or (b).

16.     Whether U.S. Patent No. 5,587,884 is prior art to the '910 patent under 35 U.S.C. § 102(a) or (e).

17.     ~~Whether Halo's activities infringe any valid claim of the '910 patent within the meaning of 35 U.S.C. § 271.~~ *GEB*

18.     Whether Plaintiffs seek to recover an amount from Halo that is a direct and proximate result of Halo's alleged infringement within the meaning of 35 U.S.C. § 284.

13.     CHOICE OF LAW:
(If there is any issue as to what state's law is applicable to any count of the complaint, set forth the choice of law question. This issue shall be separately briefed in accordance with an order to be entered herewith).

> **Not applicable.**

14.     MISCELLANEOUS (Set forth any other matters which require action by, or should be brought to the attention of the Court).

> As the party with the burden of proof on the issue of invalidity in this case, Halo intends to move the Court for permission to present its evidence first and last at trial.

*GRANTED GEB*

41

Bel Fuse will object to any such request or motion by Halo. As the patentee, it would be extremely prejudicial if Plaintiffs were not to able to present an overview of their own patent (among other things), before Defendant attempts to present evidence that the patent is allegedly invalid. *DENIED*

15.   JURY TRIALS - Not later than _MARCH 7, 2011_.

A.   ~~Each side shall submit to the Judge and to opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B, with citations to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.~~

B.   Counsel for each party shall submit to the Judge, with a copy to opposing counsel, *VOIR DIRE AND* written requests for instructions to the jury. Supplemental requests for instructions may be submitted at any time prior to argument to the jury. All requests for instructions shall be plainly marked with the name and number of the case, shall contain citations of supporting authorities, if any, and shall designate the party submitting same. In the case of multiple requests by a party, these shall be numbered in sequence and each request shall be on a separate sheet of paper.

C.   Joint proposed verdict form/special interrogatories are to be submitted to the trial judge.

16.   NON-JURY TRIALS - Not later than ~~MARCH 7~~.

A.   ~~Each side shall submit to the Judge and opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B with citation to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.~~

B.   ~~Each side shall submit to the Judge and other counsel proposed written findings of fact and conclusions of law. There is reserved to counsel the right to submit additional proposed findings of fact and conclusions of law during the course of the trial on those matters that cannot reasonably be anticipated.~~ *B. THE BRIEFING SCHEDULE FOR THE MOTIONS REFERRED TO AT PAGES 2-4 IS: INITIAL BRIEF 2/25/11, OPPOSING BRIEF 3/4/11, NO REPLY.*

17.   TRIAL COUNSEL (List the names of trial counsel for all parties).

| Trial Counsel for Plaintiffs | Trial Counsel for Defendant |
|---|---|
| Martin G. Raskin | Lanny S. Kurzweil |
| Andrew P. Nemiroff | Irene M. Hurtado |
| David B. Sunshine | Michael J. Kane |
| Philip Kouyoumdjian | William R. Woodford |
| Robin N. Brenner | Jason M. Zucchi |
|  | Craig Countryman |

18.   BIFURCATION (Where appropriate, the issues relating to liability shall be severed and tried to verdict. Thereafter, all issues relating to damages will be tried).

**Inequitable conduct will be tried to the Judge.**

The issues of liability and damages ~~SHALL~~ / **SHALL NOT** be tried separately.

19. ESTIMATED LENGTH OF TRIAL

**4 DAYS FOR LIABILITY AND DAMAGES**

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED UNLESS THE
COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE
AMENDMENT IS DISALLOWED.

s/ Andrew R. Nemiroff

Martin G. Raskin
Andrew P. Nemiroff
COZEN O'CONNOR
277 Park Avenue
New York, NY 10172
Telephone: (212) 883-4900

Attorneys for Plaintiffs

s/ Irene M. Hurtado

Lanny S. Kurzweil
Irene M. Hurtado
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Telephone: (973) 622-4444

Michael J. Kane
William R. Woodford
Jason M. Zucchi
FISH & RICHARDSON P.C.
3300 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 335-5070

Attorneys for Defendant

_____

UNITED STATES DISTRICT COURT JUDGE

DATED: _Febru 17, 2011_

(EXHIBIT LISTS TO FOLLOW)